**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

TOMMY BAKER, et al.,                                CASE NO.: 1:12-cv-112

        Plaintiffs,                                Judge Michael R. Barrett

    v.

UNION TOWNSHIP, OHIO, et al.,

        Defendants.

**OPINION AND ORDER**

This matter is before the Court on the Motion for Summary Judgment of Defendants Union Township, Ohio, The Union Township Board of Trustees, and Michael Ventre (collectively, "Defendants").[1]  (Doc. 28).  Plaintiffs Tommy Baker and Jennifer Jones have filed a response in opposition (Doc. 39), and Defendants have filed a reply (Doc. 44).  This matter is now ripe for review.

**I.      FACTUAL BACKGROUND**

This case is based upon an incident that occurred on February 14, 2011 in Union Township.  The basic facts regarding that incident are as follows:

On February 14, 2011, two officers of Union Township's police department, Officer Michael Ventre ("Officer Ventre") and Officer Danielle Smith ("Officer Smith"), received a 911 dispatch call from the bartender at the VFW Hall regarding a disturbance involving a physical fight between Plaintiff Tommy Baker ("Baker") and Claude Snow. (Doc 19, pp. 27-29, 39, 40-44, 46-47; Doc. 23, pp. 49-51; Doc. 27, p. 74).  After Officer Ventre and Officer Smith arrived at the VFW Hall, Baker came out of the front door, but

---

[1]Union Township, Ohio and the Union Township Board of Trustees are collectively referred to in this motion as "Union Township."

when he saw the officers he turned around to go back inside.  (Doc. 19, pp. 50-51; Doc. 27, pp. 88-90).  Baker then exited the VFW Hall through the back door to avoid the police officers.  (Doc. 19, pp. 51-52).   As he exited the back door, Baker walked between a parked truck and a parked van and then he began to jog to his nearby home. (*Id.* at 53).

At that same time, Officer Ventre had exited his police cruiser to wait for other officers to arrive at the scene and he heard a door shut at the back of the VFW Hall and observed Baker walking towards the woods.  (Doc. 27, pp. 90-91).  Officer Ventre claims that he called out to Baker, identifying himself as a police officer to Baker in a normal speaking voice and then requesting that Baker come back to speak to him.  (*Id.* at 93-94).  When Baker did not come back, Officer Ventre contends that he began walking towards Baker at which time Baker suddenly took off running towards the woods.  (*Id.* at 94-95).  Officer Ventre testified that he began running as fast as he could to catch up with Baker and then followed Baker into the woods.  (*Id.* at 95).

During the pursuit, Officer Ventre displayed his Taser, and he contends that he gave verbal commands to Baker to get on the ground and advised Baker that he was under arrest.  (*Id.* at 96).  According to Officer Ventre, Baker refused to comply and instead clenched his fist and assumed a fighting stance.  (*Id.*)  Officer Ventre testified that at that point he deployed his Taser at Baker but the Taser had no effect, as the top probe struck him somewhere in the chest but the bottom probe did not connect with him.  (*Id.* at 96-97).  Baker, however, testified that as he was jogging towards his home, he heard something and then felt something hit him in the leg at which point he fell to the ground in pain.  (Doc. 19, p. 54).  Baker then realized he had been tased.  (*Id.* at 54-

2

57). Nevertheless, Baker stood up and began running away from the officers to his home. (*Id.* at 56-58; Doc. 27, pp. 97-98).

Officer Ventre testified that he continued chasing Baker towards his home and observed Baker run up the stairs to a house, enter the front door, and shut the door behind him. (Doc. 27, pp. 97-98). Officer Ventre testified that when he ran up the stairs, he discovered the front door was locked, yelled "police department," and advised that he was going to kick in the front door if it was not immediately opened. (*Id.* at 98). Defendant Jennifer Jones ("Jones") came to the door, opened it, and let Officer Ventre into the house. (*Id.*)

According to Officer Ventre, the house was dark when he entered the living room area. (*Id.* at 96-98). As Officer Ventre entered, he went around a section of furniture, and observed Baker in a dark hallway. (*Id.* at 98). Officer Ventre claims that he then displayed his Taser and gave Baker more verbal commands to get on the ground. (*Id.*) He claims that Baker just stood there with his fists clenched. (*Id.*) Officer Ventre testified that he again advised Baker to get on the ground, but Baker instead approached a closed door and opened it. (*Id.*) Officer Ventre testified that as Baker opened the door, he deployed the second Taser into Baker's back, which took effect and caused Baker to fall into the doorway. (*Id.* at. 98-99). Officer Ventre testified that as he tased Baker in the back when he was moving towards the door, he was unaware that the door led to an open stairwell. (*Id.* at 98-100). He further testified that as he approached the open door, he realized for the first time that the door opened into a stairwell and he observed Baker at the bottom of that stairwell. (*Id.* at 99).

Baker offers a different account of what occurred once Officer Ventre entered the house. Baker testified that when Officer Ventre entered the house, the lights were on

3

and Baker already had opened the door to his basement intending to go downstairs. (Doc. 19, pp. 61, 65, 67). He testified that when Officer Ventre saw him, Baker was standing in the middle of the hallway in front of the door to the basement stairs. (*Id.* at 67, 81). At that time, Officer Ventre was standing near a cupboard in the living room. (*Id.* at 84-86). Baker testified that he did not move from his position until Officer Ventre deployed the Taser, at which point he twisted his upper body toward the open door. (*Id.* at 66-68, 81). After he was tased, Baker attempted to grab for the handrail to the basement stairs, but missed and tumbled down the stairs. (*Id.* at 66-68, 81). Officer Ventre then called the life squad and Baker was rushed to the hospital. (*Id.* at 71). Baker testified that his injuries included a broken neck, damage to the nerves in his arm, damage to his back, and potential cognitive impairments due to bleeding in his brain. (*Id.* at 23, 98-113, 121-22).

Jones offers a third account of what occurred at the house. She testified that when Baker entered the home, he told her the police had tased him and instructed her not to open the front door. (Doc. 21, p. 31). When Jones heard pounding on the front door, she turned on the front porch light and saw a police officer standing there repeating "police, open the door." (*Id.* at. 32-33). When Jones opened the door for Officer Ventre, he pushed her and raised his right hand at Baker who was standing in the hallway with the basement door "leaning on him." (*Id.* at 33-34). The door was partially opened and partially closed. (*Id.* at 34-36). Jones testified Baker was a big guy and was facing her and Officer Ventre with his body partially in the hallway and partially in the doorway. (*Id.* at 34-36). Jones testified that Officer Ventre told Baker "don't run" at which point Baker "turned to go down the stairs." (*Id.* at 36-37, 43). Jones testified that she yelled "don't tase him" and looked away as Officer Ventre tased Baker in the

4

back left shoulder area as he turned toward the open door. (*Id.* at 36-38, 43, 47-48, 51, 61-62, 71). Jones testified that Baker did not put his hands up, begin to get down on the ground, or indicate surrender prior to being tased. (*Id.* at 50-51). Afterwards, Jones went to see if Baker was alive but Officer Ventre told her to stay away. (*Id.* at 55). Jones testified that she has not sought medical, psychological or counseling treatment as a result of the incident and is no longer emotionally affected by the incident. (*Id.* at 17, 67-68).

Following the incident, a police report and a use of force report both were prepared. (Doc. 27, pp. 144-45, 148-49). The police report charged Baker with resisting arrest, obstructing official business, and disorderly conduct while intoxicated, all of which were misdemeanors. (*Id.* at 144-45). Both reports included a narrative of the incident from Officer Ventre. (*Id.* at 144-45, 148-49).

The next day, Chief Terrence Zinser, the police chief at the Union Township Police Department, conducted a use-of-force investigation of the incident. (*See* Doc. 25, pp. 1, 8-10, 23-26, 32, 47-48). Based on the use-of-force investigation, Chief Zinser determined that Officer Ventre's use of force was appropriate, that Officer Ventre did not violate the use-of-force policy of Union Township, and that Officer Ventre did not need retraining. (*Id.* at 19, 32). Subsequently, Baker pled no contest to the resisting arrest charge in exchange for the dismissal of the obstructing official business and disorderly conduct while intoxicated charges. (Doc. 19, pp. 91-92; Doc. 28-1).

On February 7, 2012, Baker and Jones filed this lawsuit against Union Township, the Union Township Board of Trustees, and Officer Ventre, both individually and in his official capacity. (Doc. 1). In the Complaint, Baker asserts claims for (1) excessive force under 42 U.S.C. § 1983 against all Defendants; and (2) assault and battery

5

against Officer Ventre. (Doc. 1). Jones asserts a claim for negligent infliction of emotional distress against Officer Ventre. (Doc. 1). Baker and Jones seek an award of compensatory damages against all Defendants, as well as punitive damages against Officer Ventre. (Doc. 1).

## II.    <u>LEGAL STANDARD</u>

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is "genuine" when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 1065 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). A fact is "material" only if its resolution affects the outcome of the suit. *Id.*

On summary judgment, a court must view the evidence and draw all reasonable inferences in favor of the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986). The moving party has the burden of showing an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).

Once the moving party has met its burden of production, the nonmoving party cannot rest on his pleadings, but must present significant probative evidence in support of his complaint to defeat the motion for summary judgment. *Anderson*, 477 U.S. at 249. "The mere existence of a scintilla of evidence in support of the [nonmoving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmoving party]." *Id.* at 252. Entry of summary judgment is appropriate "against a party who fails to make a showing sufficient to establish the existence of an

6

element essential of that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

## III. ANALYSIS

Defendants move to dismiss the claims asserted against them on multiple grounds. The Court will address each of those grounds below.

### A. Section 1983 Claims Against Officer Ventre

Officer Ventre contends that the Section 1983 claim against him should be dismissed for two reasons: (1) he is entitled to qualified immunity; and (2) any claim that Baker may have for excessive force is barred by *Heck v. Humphrey*, 512 U.S. 477, 114 S. Ct. 2364, 129 L. Ed. 2d 383 (1994). The Court will address each argument separately below.

#### 1. Qualified immunity

Officer Ventre first argues for dismissal on the grounds of qualified immunity. The doctrine of qualified immunity protects "government officials performing discretionary functions . . . from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S. Ct. 2727, 73 L. Ed. 2d 396 (1982) (citing *Procunier v. Navarette*, 434 U.S. 555, 565, 98 S. Ct. 855, 55 L. Ed. 2d 24 (1978); *Wood v. Strickland*, 420 U.S. 308, 322, 95 S. Ct. 992; 43 L. Ed. 2d 214 (1975)). Qualified immunity involves a two-step inquiry: (1) whether "[t]aken in the light most favorable to the party asserting the injury, . . . the facts alleged show the officer's conduct violated a constitutional right" and (2) "whether the right was clearly established." *Saucier v. Katz*, 533 U.S. 194, 201, 121 S. Ct. 2151; 150 L. Ed. 2d 272 (2001), *overruled on other grounds by Pearson v. Callahan*, 555 U.S. 223, 236, 129 S.

Ct. 808, 172 L. Ed. 2d 565 (2009) (explaining that courts may "exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand."); *Brennan v. Twshp. of Northville*, 78 F.3d 1152, 1154 (6th Cir. 1996).  Some panels of the Sixth Circuit have added a third prong that requires the Court to determine whether the plaintiff offered sufficient facts to "'indicate that what the official allegedly did was objectively unreasonable in light of the clearly established constitutional rights.'" *Feathers v. Aey*, 319 F.3d 843, 848 (6th Cir. 2003) (quoting *Williams v. Mehra*, 186 F.3d 685, 691 (6th Cir. 1999) (en banc)).  However, the Sixth Circuit has explained that the first two prongs mirror the two prongs of the *Saucier* test, while the third prong simply acknowledges the reasonableness requirement that is implicit in the clearly established prong as explained in *Saucier*.  *Sample v. Bailey*, 409 F.3d 689, 696 n.3 (6th Cir. 2005).

"Qualified immunity ordinarily applies unless it is obvious that no reasonably competent official would have concluded that the actions taken were unlawful." *Chappell v. City of Cleveland*, 585 F.3d 901, 907 (6th Cir. 2009) (citing *Ewolski v. City of Brunswick*, 287 F.3d 492, 501 (6th Cir. 2002)). Qualified immunity "'gives ample room for mistaken judgments' by protecting 'all but the plainly incompetent or those who knowingly violate the law.'"  *Id.* (quoting *Hunter v. Bryant*, 502 U.S. 224, 229, 112 S. Ct. 534, 116 L. Ed. 2d 589 (1991)) (additional internal quotations omitted).  Qualified immunity "applies irrespective of whether the official's error was a mistake of law or a mistake of fact, or a mistake based on mixed questions of law and fact."  *Id.* (citing *Pearson*, 555 U.S. at 231).

While the defendant bears the burden of pleading the defense of qualified immunity, the ultimate burden of proof is on the plaintiff to show that the defendant is

8

not entitled to qualified immunity. *Miller v. Admin. Office of Courts*, 448 F.3d 887, 894 (6th Cir. 2006) (citing *Silberstein v. City of Dayton*, 440 F.3d 306, 311 (6th Cir. 2006)).

### a. Whether there was a violation of a constitutional right

The first step in evaluating Baker's Section 1983 claim against Officer Ventre is to identify the specific constitutional right allegedly violated. Here, Baker asserts that Officer Ventre's second tasing of Baker violated Baker's right to be free from excessive force under the Fourth Amendment.

The second step is to determine whether the facts set forth by the parties, and construed in the light most favorable to Baker, demonstrate a violation of that constitutional right. A claim of excessive force in the course of making an arrest is properly analyzed under the Fourth Amendment's "objective reasonableness" standard. *Graham v. Connor*, 490 U.S. 386, 388, 109 S. Ct. 1865; 104 L. Ed. 2d 443 (1989). Thus, the question is whether Officer Ventre's actions were objectively reasonable in this matter. *Scott v. Harris*, 550 U.S. 372, 383, 127 S. Ct. 1769, 1776, 167 L. Ed. 2d 686 (2007).

In "determining the reasonableness of the manner in which a seizure is effected," a court "'must balance the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion.'" *Id.* at 1778 (quoting *United States v. Place*, 462 U.S. 696, 703, 103 S. Ct. 2637, 77 L. Ed. 2d 110 (1983)). As the Sixth Circuit has explained: "'This standard contains a built-in measure of deference to the officer's on-the-spot judgment about the level of force necessary in light of the circumstances of the particular case.'" *Marvin v. City of Taylor*, 509 F.3d 234, 245 (6th Cir. 2007) (quoting *Burchett v. Kiefer*, 310 F.3d 937, 944 (6th Cir. 2002)). "The proper application [of the objective

9

reasonableness test] requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396. In addition, the Sixth Circuit has found that "the definition of reasonable force is partially dependent on the demeanor of the suspect." *Marvin*, 509 F.3d at 245 (citing *Solomon v. Auburn Hills Police Dep't*, 389 F.3d 167, 174 (6th Cir. 2004)).

Baker contends that the proper analytical framework in an excessive force case is a segmenting approach that requires a reevaluation of the reasonableness of the force used as the circumstances change. *Dickerson v. McClellan*, 101 F.3d 1151 (6th Cir. 1996). Specifically, Baker focuses on only the segment of his encounter with the officers in the home just before and at the time Baker was tased, which is the only segment that Baker challenges as involving excessive force.

While the Court agrees that a segmenting analysis is correct, it also is necessary for the Court to view Officer Ventre's actions within the context of the totality of events. Given that the ultimate question is whether Officer Ventre's actions were reasonable, the use of force "analysis must consider all of the knowledge possessed by [the officer] at the moment he determined to employ . . . force. We cannot simply take a snapshot of the moment and consider it in isolation from other information." *Bouggess v. Mattingly*, 426 F. Supp. 2d 601, 607 (W.D. Ky. 2006) (citing *Tenn. v. Garner,* 471 U.S. 1*,* 105 S. Ct. 1694, 85 L. Ed. 2d 1 (1985)).

Here, the Court considers whether the force used by Officer Ventre during the second tasing was reasonable under the totality of the circumstances, construing the facts in favor of Baker. We first consider the severity of the crime at issue. When

Officer Ventre was dispatched to the scene, he was informed that there had been a disturbance involving Baker and that Baker had refused to leave. A disturbance generally is not a serious crime, and thus, this fact weighs in favor of using less force in arresting someone for that conduct. *See Thacker v. Lawrence County*, 182 F. App'x 464, 472 (6th Cir. 2006) (although disorderly conduct generally is a non-serious crime which weighs in favor of using less force, the officers' actions in wrestling resistant defendant to the ground was constitutional). As such, the reasonableness of Officer Ventre's actions must be weighed against this backdrop. *Solomon v. Auburn Hills Police Dep't*, 389 F.3d 167, 174 (6th Cir. 2004).

The Court next considers whether Baker posed an immediate threat to the safety of the officers or others, and whether he was actively resisting arrest or attempting to flee. There is no dispute that Baker did not act violently towards the officers. However, there also is no dispute that he fled from the officers and continued to flee after the first tasing. He fled into the home and locked the door. What happened once Officer Ventre entered the home is subject to genuine issues of material fact. On one hand, Officer Ventre contends that when he entered the home less than a minute later, Baker was standing in a dim hallway with the door next to him closed with his fists clenched. Baker then reached for and opened the door next to him, at which point Officer Ventre commanded him not to run and then tased him. Officer Ventre contends that he did not see or know that the door Baker opened led to a stairwell.

However, Baker and Jones both contend that Officer Ventre found Baker standing inside a partially opened door, with the door leaning on Baker's left shoulder. According to Jones, Baker was a big guy. However, they contend that Baker was not in a fighting stance when Officer Ventre entered the home, but he also did not surrender or

11

otherwise indicate an intent to surrender when Officer Ventre entered the home. The facts construed in favor of Baker also suggest that the hallway was lit and that Officer Ventre did not command Baker to do anything to show his intent to surrender. Baker testified that he did not move from the door during the time Officer Ventre was in the home except at the exact moment he was being tased. Jones, however, testified that she heard Officer Ventre say to Baker "don't run," which occurred as Baker turned towards the entry of the doorway. Jones yelled "don't tase him," and then turned away as she saw the Taser being deployed. Jones testified that there was no time for a reaction by Baker between the "don't run" command and the deployment of the Taser.

Courts have found that genuine issues of material fact as to the nature of events that occurred will preclude summary judgment based on the first prong of an excessive force claim. For example, in *Shreve v. Jessamine County Fiscal Court*, 453 F.3d 681, 686-87 (6th Cir. 2006), the Sixth Circuit reversed the grant of summary judgment to the defendant because there were genuine issues of material fact as to whether excessive force was used when the plaintiff's account of the events showed that after she was thrown to the ground and pepper sprayed, and she refused to produce her hands for cuffing at which time the deputy struck her with a stick and repeatedly jumped on her back with his knee for fifteen minutes. The Sixth Circuit analyzed the circumstances as follows:

> [E]ven to a reasonable policeman in the heat of the moment, the deputies' interest in an arrest could not have justified striking [the plaintiff] in the eye with a stick ten to twelve times while she was on the ground and "out of it" due to the pepper spray. Nor could the interest in an arrest have justified jumping up and down on her back with a knee, or striking her about the neck and shoulders with the stick, for around fifteen minutes. These alleged actions go so far beyond forcing [the plaintiff] to produce her hands that no reasonable

12

> policeman could see them as nonexcessive, not even in the heat of the situation.
>
> It is true that the evidence of the deputies at this stage appears significantly stronger than that of Shreve. All except [the plaintiff] testified consistently to a version of events in which no excessive force occurred. [The Plaintiff], however, swore to a version of the facts that does amount to excessive force. To be sure, there are inconsistencies in [the plaintiff's] statements: she did not see the deputies holding nightsticks while hitting her, and there is not much physical evidence in support of her version of events. She did however testify that she felt the stick hitting her and that she saw a deputy holding a stick at some point. It is therefore ultimately up to the jury to believe her or not.
>
> This is not a case where the defendants' evidence is so objectively compelling that no reasonable juror could believe Shreve. In determining whether to grant summary judgment, a court may not make determinations of witness credibility.

*Id.* at 687-88.

Similarly, in *Baker v. City of Hamilton*, 471 F.3d 601, 607-08 (6th Cir. 2006), the Sixth Circuit found that under the totality of the circumstances there were genuine issues of material fact as to whether the officer had used excessive force on two suspects. The first suspect initially fled from the officer, and the officer followed him into a row of bushes. *Id.* at 607. At that point, the suspect came out from behind the bushes with his hands straight up in the "surrender" position. *Id.* When he came out of the bushes, the officer struck the suspect in the head and knocked him to the ground, yelling "[t]hat's for running from me." *Id.* The Sixth Circuit held that because the suspect had surrendered before being struck, showing he was unarmed and compliant, a reasonable jury could conclude that the officer's strike to the suspect's head was unjustified and excessive. *Id.* Further, a jury could have found that the officer acted unreasonably in striking the suspect's knee after he had fallen to the ground because the repeated use of force "after a suspect has been incapacitated or neutralized is

13

excessive as a matter of law." *Id.* The Sixth Circuit found that the fact that the suspect had not yet been handcuffed at the time he was struck did not preclude a finding of unreasonableness. *Id.* (citing *Tapp v. Banks*, 1 Fed. App'x 344, 350 (6th Cir. 2001) ("[I]t is not objectively reasonable for an officer dealing with an essentially compliant person, to strike the person's legs twelve to fifteen times in the absence of resistance."). Nor did the fact that the suspect had attempted to evade arrest preclude his claim of excessive force. *Id.* at 608 (citing *Shreve*, 453 F.3d at 687).

Considering the Sixth Circuit precedent, the Court finds that, although it may be a close call, a reasonable jury adopting Baker's account of events could find that Baker was essentially compliant, as he was not attempting to flee and was not actively resisting arrest. A reasonable jury also could conclude that Baker did not pose an immediate threat to the safety of others given that he had not moved and was not armed, and that Officer Ventre did not give him time to comply with any command. As the Sixth Circuit recognized in *Baker*, the fact that Baker initially attempted to flee does not preclude a finding of excessive force.

Moreover, in evaluating the totality of the circumstances, the Court also must consider the location of Baker at the time of the tasing, which was near the top of a staircase leading to a basement. On this issue, the Court looks to the Eighth Circuit's decision in *McKenney v. Harrison*, 635 F.3d 354, 359-60 (8th Cir. 2011). The *McKinney* court held that a police officer was entitled to qualified immunity even though he tased an individual as he lunged toward an open window six to eight feet away, and that individual then continued through the window and died from his injuries. *Id.* at 360. The court recognized that "although the outcome was tragic, a reasonable officer, knowing that a Taser is designed to incapacitate instantly, could have believed that the force

14

would incapacitate [the individual] before he reached the window, while he was not in an 'elevated position' and likely to fall." *Id.* Accordingly, it found that under the circumstances, the force used by the officer was reasonable. *Id.*

Here, the facts suggest that Baker may have been closer to the elevated surface than the plaintiff in *McKenney*, although the elevated surface in this case may not been as open and obvious as the window in *McKenney*. When, however, the facts are construed in favor of Baker, they could reasonably show that Officer Ventre would have known that Baker was standing at the top of a stairwell. Specifically, there is testimony from Baker and Jones that the door to the basement was open and testimony from Baker that the light in the hallway was turned on. There also is testimony as to the to the locations where Baker and Officer Ventre allegedly were standing in relation to each other from which a reasonable jury could infer that Officer Ventre could have seen the railing in the stairwell. Further, Baker has presented evidence that Union Township trains its officers not to tase a suspect who is at the top of the stairs because to do so can result in serious injury or death. (Doc. 25, pp. 33-36; Doc. 36, p. 11). Officer Ventre also admits that he had been trained to evaluate the environment to look for elevated surfaces, but that he did not do so in this case before deploying his Taser. (Doc. 27, pp. 61-62, 68-71, 132). Although the Court recognizes that Officer Ventre offers a different version of the facts, a credibility determination must be made as to which version of facts is accurate before the Court can decide whether, from the perspective of a reasonable officer on the scene, the force used was not excessive. That determination is not appropriate for the Court to make at the summary judgment stage. Instead, the resolution of those discrepancies must be reserved for a jury.

15

For the foregoing reasons, the Court does not find that the first prong of the analysis entitles Officer Ventre to qualified immunity at this stage of the litigation, as the facts construed in the light most favorable to Baker raise genuine issues of fact that must be resolved prior to a determination of whether excessive force was used.

### b. Whether the constitutional right was clearly established

Next, the Court must consider whether the constitutional right is clearly established. The Sixth Circuit recently provided some guidance on how to decide whether a right has been clearly established:

> [T]he Supreme Court has "repeatedly" warned lower courts not to define the right at "a high level of generality." *Ashcroft v. al-Kidd*, __ U.S. __, 131 S. Ct. 2074, 2084, 179 L. Ed. 2d 1149 (2011). . . . "The general proposition" that the Fourth Amendment prohibits police officers from using excessive force "is of little help in determining whether the violative nature of [the plaintiff's] particular conduct [was] clearly established." *al-Kidd*, 131 S. Ct. at 2084. It is sometimes worse than that: If a court does not carefully define the right, it risks collapsing the two qualified-immunity inquiries into one, permitting the constitutional-violation inquiry *always* to answer the clearly established inquiry. Precedent demands instead that we go down the stairs of abstraction to a concrete, particularized description of the right. Though not too far down: just as a court can generalize too much, it can generalize too little. If it defeats the qualified-immunity analysis to define the right too broadly (as the right to be free of excessive force), it defeats the purpose of § 1983 to define the right too narrowly (as the right to be free of needless assaults by left-handed police officers during Tuesday siestas).
>
> Examples abound of an appropriate middle ground. In an excessive-force case, that might mean asking whether "a disturbed felon, set on avoiding capture through vehicular flight [that placed] persons in the immediate area . . . at risk" had a clearly established right not to be shot. *Brosseau v. Haugen*, 543 U.S. 194, 200, 125 S. Ct. 596, 160 L. Ed. 2d 583 (2004) (per curiam). Or, closer to today's case, it might mean asking "whether a misdemeanant, fleeing from the scene of a non-violent misdemeanor, but offering no other resistance and disobeying no official command, had a clearly established right not to be tased." *Cockrell v. City of Cincinnati*, 468 F. App'x 491, 495 (6th Cir. 2012).

*Hagans v. Franklin Cnty. Sheriff's Office*, 695 F.3d 505, 508-09 (6th Cir. 2012). The

Sixth Circuit went on to explain the general position on excessive force cases:

> Cases from this circuit and others . . . adhere to this line: If a suspect actively resists arrest and refuses to be handcuffed, officers do not violate the Fourth Amendment by using a taser to subdue him. Consider cases from this circuit first. In *Williams v. Sandel*, 433 F. App'x 353 (6th Cir. 2011), officers confronted a suspect who was high on ecstasy, nude and jogging along the interstate at midnight. *Id.* at 354. The suspect refused to be handcuffed, prompting officers to tase him *thirty-seven* times (and to use batons and pepper spray as well) until he stopped resisting. *Id.* at 362. We held the officers' use of force was reasonable. *Id.* at 363. Or consider *Caie v. W. Bloomfield Twp.*, No. 11-1378, 485 F. App[']x[] 92, 2012 U.S. App. LEXIS 12507, 2012 WL 2301648 (6th Cir. June 18, 2012). After two officers wrestled the suspect to the ground, he refused to move his arms from under his body, prompting a third officer to tase him. 2012 U.S. App. LEXIS 12507, [WL] at *2. The tasing was reasonable given the suspect's "active[] resist[ance] [to] the officers' attempts to secure his arms behind his back." 2012 U.S. App. LEXIS 12507, [WL] at *4; *see also Williams v. Ingham*, 373 F. App'x 542, 548 (6th Cir. 2010) (officers acted reasonably by tasing suspect who would not move his hands from under his body).
>
> By contrast, when we have found excessive force, the suspects were compliant or had stopped resisting. In *Kijowski v. City of Niles*, 372 F. App'x 595 (6th Cir. 2010), officers used excessive force by tasing a wedding guest who was sitting in his truck, not disobeying police commands. *Id.* at 600-01. And in *Landis v. Baker*, 297 F. App'x 453 (6th Cir. 2008), officers used excessive force by repeatedly tasing a suspect who was pinned on the ground with his face submerged in muddy water. *Id.* at 464; *see also Roberts v. Manigold*, 240 F. App'x 675, 676 (6th Cir. 2007) (officers used excessive force by repeatedly tasing suspect even though he was "completely pinned"); *cf. Champion v. Outlook Nashville, Inc.*, 380 F.3d 893, 901 (6th Cir. 2004) (officers used excessive force by dousing suspect with pepper spray after he was immobilized with handcuffs and leg shackles and stopped resisting).
>
> A suspect's active resistance also marks the line between reasonable and unreasonable tasing in other circuits. *Compare McKenney v. Harrison*, 635 F.3d 354, 360 (8th Cir. 2011) (tasing suspect who bolted toward second-story window in an attempt to escape was not excessive force); *Draper v. Reynolds*, 369 F.3d 1270, 1277-78 (11th Cir. 2004) (tasing suspect who acted belligerently and refused to provide his license and registration after a traffic stop was not excessive force); and *Hinton v. City of Elwood,*

997 F.2d 774, 781 (10th Cir. 1993) (tasing suspect three times who actively resisted officers' attempts to handcuff him was not excessive force); *with Cavanaugh v. Woods Cross City*, 625 F.3d 661, 665 (10th Cir. 2010) (tasing non-resistant suspect was excessive force); *Oliver v. Fiorino*, 586 F.3d 898, 906-07 (11th Cir. 2009) (tasing suspect ten times was excessive force because he stopped resisting after the first shock); *Brown v. City of Golden Valley*, 574 F.3d 491, 498-99 (8th Cir. 2009) (tasing car passenger who was not attempting to flee or resist arrest was excessive force); *and Casey v. City of Fed. Heights*, 509 F.3d 1278, 1282 (10th Cir. 2007) (tasing a non-violent misdemeanant who was not offering any resistance was excessive force).

One decision bucks this trend—kind of. In two consolidated cases, the en banc Ninth Circuit held that officers used excessive force by tasing suspects who offered minimal resistance. *Mattos v. Agarano*, 661 F.3d 433 (9th Cir. 2011) (en banc). In the first case, a pregnant woman whom officers pulled over for speeding refused to sign a citation and refused to get out of her car, leading the officers to tase her three times and to handcuff her. *Id.* at 436-38. In the second case, an officer trying to arrest a domestic-abuse suspect tased the suspect's wife when she failed to move out of the way. *Id.* at 438-39. Whatever glimmer of hope the Ninth Circuit's holdings on the constitutional issue offer *Hagans* is closed by the reality that the court held the officers were entitled to qualified immunity because the right was not clearly established at the time of the encounters. *Id.* at 448, 452. If it did not violate clearly established law to tase a pregnant mother who refused to sign a traffic citation in November 2004, how could it violate clearly established law to tase an out-of-control, shirtless man strung-out on drugs who was thrashing about with two officers on the ground in May 2007? [The plaintiff] has not shown any changes in the law over that period or for that matter any law specific to the Sixth Circuit that would clearly establish the illegality of this far more reasonable use of a taser.

The suspect in *Hagans* was tased in drive-stun mode several times after smoking crack cocaine, running around his yard screaming, and failing to obey officers' commands to stop. *Id.* at 510-11. The Court held that the officer was entitled to qualified immunity on an excessive force claim because the suspect was out of control and continued to forcefully resist arrest, and it was not clearly established in May 2007 that using a Taser

repeatedly on a suspect actively resisting arrest and refusing to be handcuffed amounted to excessive force.  *Id.*

In *Cockrell v. City of Cincinnati*, 468 F. App'x 491, 495-96 (6th Cir. 2012), the Sixth Circuit again engaged in a similar analysis, stating:

> Cases addressing qualified immunity for taser use fall into two groups. The first involves plaintiffs tased while actively resisting arrest by physically struggling with, threatening, or disobeying officers.  In the face of such resistance, courts conclude either that no constitutional violation occurred, or that the right not to be tased while resisting arrest was not clearly established at the time of the incident. *Mattos*, 661 F.3d 433 (holding, in consolidated cases, that 2004 and 2006 taser deployments constituted excessive force, but did not violate clearly established law, where one plaintiff, a pregnant woman pulled over for speeding, refused to sign citation, became agitated, screamed at officers, clung to steering wheel, and was tased three times, and other plaintiff, also a woman, was shot with taser in dart mode as she stood between officers and her large, drunken, aggressive husband who was under arrest); *McKenney v. Harrison*, 635 F.3d 354 (8th Cir. 2011) (holding that 2007 taser deployment against misdemeanant who made sudden move toward window while being questioned by police and told not to "try anything stupid" did not constitute excessive force, even though misdemeanant fell out of window to his death after being tased); *Bryan* [*v. MacPherson*], 630 F.3d 805 [(9th Cir. 2010)] (holding that 2005 taser deployment against motorist yelling angrily and acting erratically after traffic stop for failing to wear seatbelt violated Fourth Amendment, but not clearly established law); *Baird v. Ehlers*, No. C10-1540JLR, 2011 U.S. Dist. LEXIS 134307, 2011 WL 5838431 (W.D. Wash. Nov. 21, 2011) (holding that using taser three times on man who, in "drunken stupor," was physically removed from city bus, and  engaged in verbal and physical confrontation with officer, may have been excessive use of force, but that law regarding taser use was not clearly established as of November 2009); *Carter v. City of Carlsbad*, 799 F. Supp. 2d 1147, 2011 WL 2601027 (S.D. Cal. 2011) (holding that use of taser against large, belligerent, drunken ex-marine who "took an offensive fighting stance" may have been excessive, but did not violate clearly established law on October 31, 2009); *Azevedo v. City of Fresno*, No. 1:09–CV–375, 2011 U.S. Dist. LEXIS 10132, 2011 WL 284637 (E.D. Cal. Jan. 25, 2011) (holding that use of taser against suspect detained during investigation of burglary, who fled after being asked about weapons then was warned to stop, may have violated Fourth Amendment, but did not violate clearly established law, as of November 2007); *Sanders v.*

19

*City of Dothan*, 671 F. Supp. 2d 1263 (M.D. Ala. 2009) (holding that officer who tased detained, but uncooperative, suspect using drive-stun mode did not violate clearly established law, as of August 2005); *Beaver v. City of Federal Way*, 507 F. Supp. 2d 1137 (W.D. Wash. 2007) (holding that, of five August 2004 taser deployments against suspect who fled scene of residential burglary and refused to obey command to stop, first three were not excessive uses of force, since officer had to make split-second decisions on how to subdue disobedient, fleeing felon, while last two constituted excessive force because suspect was no longer immediate threat; qualified immunity still was appropriate, however, because law was not clearly established).

In the second group of cases, a law-enforcement official tases a plaintiff who has done nothing to resist arrest or is already detained. Courts faced with this scenario hold that a § 1983 excessive-force claim is available, since "the right to be free from physical force when one is not resisting the police is a clearly established right." *Kijowski v. City of Niles*, 372 F. App'x 595, 601 (6th Cir. 2010) (quoting *Wysong v. City of Heath*, 260 F. App'x 848, 856 (6th Cir. 2008)); *see also Brown v. City of Golden Valley*, 574 F.3d 491 (8th Cir. 2009) (holding that tasing non-violent passenger during traffic stop for failure to hang up from 911 call violated clearly established law, as of October 2005); *Landis v. Baker*, 297 F. App'x 453 (6th Cir. 2008) (holding that repeated use of taser against subdued defendant lying face-down in swamp water violated clearly established law, as of November 2004); *Casey* [*v. City of Federal Heights*], 509 F.3d 1278 [(10th Cir. 2007)] (holding that officers' tasing [of] compliant, non-violent misdemeanant violated clearly established law, as of August 2003); *Shekleton v. Eichenberger*, No. C10-2051, 2011 U.S. Dist. LEXIS 45038, 2011 WL 1578421 (N.D. Iowa Apr. 26, 2011) (holding that tasing non-violent misdemeanant, who did not resist arrest, struggle with, or pose a threat to, officers, or attempt to flee, violated clearly established law, as of September 2008); *Borton v. City of Dothan*, 734 F. Supp. 2d 1237 (M.D. Ala. 2010) (holding that tasing mentally disturbed patient who was not under arrest three times, even though she was secured to a gurney with handcuffs and restraints, was violation of clearly established law, as of August 2006); *Orsak* [*v. Metro. Airports Comm'n Airport Police Dep't*], 675 F. Supp. 2d 944 [(D. Minn. 2009)] (holding that officers who pulled cyclist from bike, stood him up, and shot him with taser may have violated clearly established law, as of September 2006); *Asten v. City of Boulder*, 652 F. Supp. 2d 1188 (D. Colo. 2009) (holding that "the unforewarned tasing of a mentally unstable woman [who was not under arrest] in her own home" violated clearly established law, as of October 2006).

The *Cockrell* court ultimately held that the case did not fit cleanly within either group because at no point did the plaintiff use violence, make threats, or even disobey a command to stop.  *Id.* at 496.  Instead, he simply fled.  *Id.*  However, the Court found that "flight, non-violent though it may be, is still a form of resistance." *Id.* (citing *Azevedo v. City of Fresno*, No. 1:09-cv-375, 2011 U.S. Dist. LEXIS 10132, at *29 (E.D. Cal. Jan. 25, 2011) ("[A]lthough Azevedo was not physically resisting arrest, he was actively fleeing. . . . The active evasion or flight by a non-felon generally favors a police officer's use of non-deadly force.")).  Accordingly, the Sixth Circuit held that those "broad principles do not establish the contours of the right [the officer] allegedly violated so clearly that every reasonable officer would know his actions were unconstitutional, even today." *Id.* at 497.

As explained above, there are genuine issues of material fact as to Baker's demeanor at the time of the second tasing.  Those issues of material fact include whether Baker was actively resisting or attempting to flee at the time of the tasing, and whether he posed an immediate threat of harm to Officer Ventre.  If those material issues of fact are resolved in favor of Baker, then Baker could be found to be a non-fleeing, non-resisting suspect in a misdemeanor crime who did not pose an immediate threat to anyone.  As such, the relevant question is whether it was clearly established as of February 14, 2011 that using a Taser on a misdemeanor suspect who had been fleeing but who at the moment was not fleeing, not actively resisting arrest, and not disobeying any commands, amounted to excessive force.  The Court finds that under those circumstances, the right to be free from excessive force has been clearly established.  *See, e.g.*, *Kijowski v. City of Niles*, 372 F. App'x 595, 601 (6th Cir. 2010) (quoting *Wysong v. City of Heath*, 260 F. App'x 848, 856 (6th Cir. 2008)) ("the right to

be free from physical force when one is not resisting the police is a clearly established right.").[2]  Accordingly, Officer Ventre is not entitled to qualified immunity at this stage of the litigation, and summary judgment is denied to Officer Ventre on Baker's Section 1983 claim.

### 2. <u>Whether the Section 1983 claim barred by *Heck*</u>

Defendants contend that any claim that Baker may have for excessive force is barred by *Heck v. Humphrey*, 512 U.S. 477, 114 S. Ct. 2364, 129 L. Ed. 2d 383 (1994). However, Defendants did not originally move for summary judgment on this ground and it was not an issue raised by Plaintiffs in their response in opposition to summary judgment.   Instead, it was raised by Defendants for the first time in their reply brief.

"[A] reply brief is not the proper place to raise an issue for the first time."  *United Tel. Co. v. Ameritech Servs., Inc.,* No. 2:10-cv-249, 2011 U.S. Dist. LEXIS 1746, at *10 n. 2 (S.D. Ohio Jan. 7, 2011); *see also Tonguette v. Sun Life & Health Ins. Co. (U.S.),* No. 2:12-cv-00006, 2013 U.S. Dist. LEXIS 60716, at *11-12 (S.D. Ohio Apr. 29, 2013). An issue raised for the first time in a reply brief has not been fully briefed, and thus, is not appropriate for decision.  *See Tonguette*, 2013 U.S. Dist. LEXIS 60716, at *11-12; *see also Versatile Helicopters v. City of Columbus*, 879 F. Supp. 2d 775, 779-80 (S.D. Ohio 2012) (abstaining from consideration of argument raised for the first time in a summary judgment reply memorandum); *Culy Constr. & Excavating, Inc. v. Laney Directional Drilling Co.*, No. 2:12-cv-4, 2012 U.S. Dist. LEXIS 79575, at *10-11 (S.D. Ohio June 8, 2012) (refraining from considering argument first raised in a reply memorandum); *Tolstih v. L.G. Elecs., U.S.A., Inc.*, No. 2:07-cv-582, 2009 U.S. Dist.

---

[2]Baker does not argue that the right to be free from excessive force while in an elevated position has been clearly established.  Therefore, the Court will not consider that issue here.

LEXIS 98676, at *17-18 (S.D. Ohio Oct. 2, 2009) (refusing to consider an argument improperly raised for the first time in a reply memorandum); *Ferron v. Search Cactus, L.L.C.*, No. 2:06-cv-327, 2007 U.S. Dist. LEXIS 44473, at *13 (S.D. Ohio June 19, 2007) (rejecting an argument improperly raised for the first time in a reply memorandum). Accordingly, the Court will not consider here Defendants' argument that the Section 1983 claim is barred by *Heck*.

### B. State Law Claims Against Officer Ventre

Baker asserts state law claims of assault and battery against Officer Ventre. Jones asserts a state law claim of negligent infliction of emotional distress against Officer Ventre.

#### 1. Assault and battery

Officer Ventre moves for summary judgment on the assault and battery claims on the basis of immunity under Ohio Revised Code § 2744.03. Subject to a few exceptions, Ohio Revised Code § 2744.02(A)(1) provides that political subdivisions are "not liable in damages in a civil action for injury, death, or loss to person or property allegedly caused by an act or omission of the political subdivision or an employee of the political subdivision in connection with a governmental or proprietary function." That immunity is extended, with three exceptions, to employees of political subdivisions under Ohio Revised Code § 2744.03(A)(6). Of relevance here is the second exception, which provides that an employee is not immune from liability if his "acts or omissions were with malicious purpose, in bad faith, or in a wanton or reckless manner." Ohio Rev. Code § 2744.03(A)(6)(b); *see also Rush v. City of Mansfield*, 771 F. Supp. 2d 827, 876 (N.D. Ohio 2011). "Wanton misconduct" is the "failure to exercise any care toward those to whom a duty of care is owed in circumstances in which there is great

probability that harm will result." *Anderson v. Massillon*, 134 Ohio St. 3d 380, 388, (2012).  "Reckless conduct" is "characterized by the conscious disregard of or indifference to a known or obvious risk of harm that is unreasonable under the circumstances and is substantially greater than negligent conduct." *Id.*

The parties agree that the assault and battery claims against Officer Ventre "rise and fall" with the excessive force claim.  (Doc. 28, p. 19; Doc. 39, ¶ 23).  The question is whether Officer Ventre acted with a malicious purpose, in bad faith, or in a wanton or reckless manner.  Officer Ventre argues that his conduct could not have been malicious, wanton, or reckless as is required to preclude immunity under Ohio Revised Code § 2744.03 because he did not use excessive force.  In support, he relies on *Hagans v. Franklin County Sheriff's Office*, 695 F.3d 505 (6th Cir. 2012), in which an officer was entitled to statutory immunity under Ohio Revised Code § 2744.03(A)(6)(b) on an assault and battery claim that was premised on a decedent dying after being tased by the officer because the officer did not violate a clearly established right, and nothing else showed that the officer otherwise acted with malicious purpose, in bad faith, or in a wanton or reckless manner.

Unlike in *Hagans*, the Court has found that Officer Ventre is not entitled to qualified immunity at this stage of the litigation on the excessive force claims brought pursuant to 42 U.S.C. § 1983.  Specifically, the Court has held that there are genuine issues of material fact as to whether excessive force was used in this case and which preclude a finding that the constitutional right was not clearly established.  Those unresolved factual questions concern the demeanor of Baker at the time of the second tasing.  There also are unresolved factual issues relating to whether Officer Ventre knew that Baker was standing on the top of a staircase at the time of that second tasing

and tased him anyway despite knowing and having received training on not tasing a suspect who is at the top of the stairs because to do so can result in serious injury or death. The manner in which those factual disputes are resolved will determine whether Officer Ventre can be said to have acted wantonly or recklessly in this case. Therefore, given that the Section 1983 claim survives summary judgment, Officer Ventre also is denied summary judgment based on immunity under Ohio Revised Code § 27440.3(A)(6)(b) at this stage of the litigation with respect to Baker's claims for assault and battery.

### 2. Negligent infliction of emotional distress

Officer Ventre moves for summary judgment on Jones' claim for negligent infliction of emotional distress on the ground that he is entitled to immunity under Ohio Revised Code § 2744.03(A)(6)(b). Officer Ventre also contends in a cursory fashion that Jones' claim for negligent infliction of emotional distress must fail because she has not suffered serious emotional distress.

Jones responds that Officer Ventre would be entitled to immunity on Jones' "negligent infliction of emotional distress claim . . . if Ventre's actions are found only to be negligent." (Doc. 39, p. 23). However, Jones argues, "[g]iven that material facts are in dispute on the Section 1983 claim and [that] those same facts would establish recklessness and defeat 2744 immunity, summary judgment should be denied to Ventre on Ms. Jones' state law claim." (Doc. 39, p. 23). Jones also responds that whether she suffered serious emotional distress is a material fact for the jury to decide given that she testified to the emotional impact she suffered at the time of the tasing. (*Id.*)

As mentioned above, an employee of a political subdivision is not immune from liability if his "acts or omissions were with malicious purpose, in bad faith, or in a wanton

or reckless manner." Ohio Rev. Code § 2744.03(A)(6)(b). "Reckless conduct" is "characterized by the conscious disregard of or indifference to a known or obvious risk of harm that is unreasonable under the circumstances and is substantially greater than negligent conduct." *Anderson*, 134 Ohio St. 3d at 388. An employee of a political subdivision "is immune from liability for negligent acts or omissions." *Anderson*, 134 Ohio St. 3d at 386.

Here, Jones' claim for negligent infliction of emotional distress, by its very nature, would impose liability for negligence, and not for recklessness, on Officer Ventre. To allow Jones to maintain a tort claim "grounded in negligence [would be] inconsistent with [Ohio Revised Code § 2744.03(A)(6)(b)], which requires a higher level of culpability in order to remove the immunity of political subdivision employees." *Piro v. Franklin Twp.*, 102 Ohio App. 3d 130, 143, 656 N.E.2d 1035 (Summit App. 1995). As such, the Court holds that Jones cannot maintain her claim for negligent infliction of emotional distress because of the immunity provided to Officer Ventre under Ohio Revised Code § 2744.03(A)(6)(b). Summary judgment is therefore granted to Officer Ventre on Jones' claim for negligent infliction of emotional distress.[3]

Given the dismissal based upon immunity, the Court need not consider whether there are genuine issues of material fact on whether Jones suffered serious emotional distress.

### C. Punitive Damages Against Officer Ventre

---

[3] To apply the recklessness exception to employee immunity, Jones would have had to bring a claim for intentional or reckless infliction of emotional distress against Officer Ventre, which would require at least the same level of culpability as the immunity exception. Jones did not bring such a claim in the Complaint nor has she argued in her response in opposition that the Court should apply the standards for intentional or reckless infliction of emotional distress. Instead, she advocates only for a claim of negligent infliction of emotional distress. As such, the Court will not consider her claim to be one for intentional or reckless infliction of emotional distress.

Officer Ventre argues that punitive damages against him in his individual capacity are not appropriate because Plaintiffs cannot establish the "actual malice" required in Ohio for such an award. (Doc. 28, p. 20). Plaintiffs respond that punitive damages are recoverable in a Section 1983 case because Ohio law recognizes recklessness as a culpable state of mind to satisfy Ohio's "actual malice" standard. (Doc. 39, p. 23) (citing *Wright v. County of Franklin*, 881 F. Supp. 2d 887 (S.D. Ohio 2012)). In the reply brief, Officer Ventre argues in one sentence that Plaintiffs are not entitled to punitive damages since, allegedly, they have not established an exception to immunity for which Officer Ventre may be liable. (Doc. 44, p. 23).

Punitive damages are available under Section 1983 when a defendant's conduct is proven to be motivated by "'evil motive or intent'" or when it involves "'reckless or callous indifference to the federally protected rights of another.'" *Wright*, 881 F. Supp. 2d at 914 (quoting *Smith v. Wade*, 461 U.S. 30, 56, 103 S. Ct. 1625, 75 L. Ed. 2d 632 (1983)). Likewise, Ohio law governing punitive damages defines "actual malice" as "(1) that state of mind under which a person's conduct is characterized by hatred, ill will or a spirit of revenge, or (2) a conscious disregard for the rights and safety of other persons that has a great probability of causing substantial harm." *Preston v. Murty*, 32 Ohio St. 3d 334, 336, 512 N.E. 2d 1174 (1987) (emphasis added); *see also Wright*, 881 F. Supp. 2d at 914 (citing *Preston*, 32 Ohio St. at 336); *Cabe v. Lunich*, 70 Ohio St. 3d 598, 602, 640 N.E.2d 159 (1994); *Kelley v. Buckley*, 193 Ohio App. 3d 11, 37 950 N.E.2d 997 (2011). The second definition of "actual malice" permits punitive damages for a state of mind equivalent to recklessness. *See Preston*, 32 Ohio St. 3d at 335 (explaining that actual malice includes "extremely reckless behavior revealing a conscious disregard for a great and obvious harm"); *Wright*, 881 F. Supp. 2d at 915 ("Ohio law recognizes

27

recklessness as a culpable state of mind sufficient to satisfy the 'actual malice' standard for punitive damages.") (citing *Villella v. Waikem Motors*, 45 Ohio St. 3d 36, 37, 543 N.E.2d 464 (1989), *modified on other grounds by Moskovitz v. Mt. Sinai Medical Ctr.*., 69 Ohio St. 3d 638, 1994 Ohio 324, 635 N.E.2d 331 (1994)).

Baker has presented at least a genuine issue of material fact as to whether Officer Ventre acted recklessly.  Baker's claim under Section 1983 requires a finding of unreasonableness, which is a standard that may encompass facts sufficient to prove recklessness.  Likewise, Baker's assault and battery claims require a finding of at least recklessness.  For the reasons previously explained, the Court has found that there are genuine issues of material fact that preclude summary judgment on each of those claims.  If those genuine issues of material fact are construed in favor of Baker, then a reasonable jury could find that Officer Ventre acted recklessly when tasing Baker on the second occasion with knowledge that his conduct had a high probability of causing substantial harm or injury.  Accordingly, the same facts that this Court found to create genuine issues of material fact on Baker's Section 1983 claim and his assault and battery claims also create genuine issues of material fact for trial on the prayer for punitive damages.  Officer Ventre is therefore denied summary judgment on the issue of punitive damages.

### D.  Claims Against Union Township

Baker contends that Union Township is liable under 42 U.S.C. § 1983 for his injuries.  *See Monnell v. New York City Dep't of Soc. Servs.*, 436 U.S. 658, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978).  Defendants move for summary judgment on that claim. (Doc. 28, pp. 17-18).  Where, as here, a Section 1983 claim is made against a

municipality,[4] the Court must engage in a two-prong analysis: (1) whether the plaintiff's harm was caused by a constitutional violation; and (2) if so, whether the municipality is responsible for that violation. *Collins v. City of Harker Heights*, 503 U.S. 115, 120, 112 S. Ct. 1061; 117 L. Ed. 2d 261 (1992); *see also Cash v. Hamilton Cnty. Dep't of Adult Prob.*, 388 F.3d 539, 542 (6th Cir. 2004).

### 1.  Constitutional violation

"A finding that a constitutional violation occurred is required to deny [individual] defendants qualified immunity and to state a claim of municipal liability." *Estate of Smithers v. City of Flint*, 602 F.2d 758, 767 n. 9 (citing *Watkins v. City of Battle Creek*, 273 F.3d 682, 687 (6th Cir. 2001)) (internal citation omitted). "If no constitutional violation by the individual defendants is established, the municipal defendants cannot be held liable under § 1983." *Watkins*, 273 F.3d at 687; *see also Wilson v. Morgan*, 477 F.3d 326, 337 (6th Cir. 2007).

As previously explained, there are genuine issues of material fact that exist in the present case which preclude a finding at this time that there was no constitutional violation by Officer Ventre. If those genuine issues of material fact are resolved in favor of Baker, then the first prong of municipal liability will be established against Union Township. It thus is not appropriate to dismiss the Section 1983 claim against Union Township at this time for lack of a constitutional violation. Therefore, the Court will turn to the second prong of the test for municipal liability.

### 2.  Whether Union Township is responsible for the violation

---

[4] Federal caselaw indicates that "municipal liability" includes not only municipalities, but also other political subdivisions such as counties and townships. *See Peabody v. Perry Twp.*, No. 2:19-cv-1078, 2013 U.S. Dist. LEXIS 46344, at *19 n. 1 (S.D. Ohio Mar. 29, 2013).

As for the second prong, municipalities and other bodies of local government may be sued pursuant to 42 U.S.C. § 1983 if they are "'alleged to have caused a constitutional tort through a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers.'" *Cash*, 388 F.3d at 542 (quoting *City of St. Louis v. Praprotnik*, 485 U.S. 112, 121, 99 L. Ed. 2d 107, 108 S. Ct. 915 (1988)) (internal quotations omitted). Section 1983 also "'authorizes suit for constitutional deprivations visited pursuant to governmental "custom" even though such a custom has not received formal approval through the body's official decisionmaking channels.'" *Id.* at 542-43 (quoting *Praprotnik*, 485 U.S. at 121) (internal quotations omitted). Although a Section 1983 plaintiff might not be able to demonstrate that a written policy exists, he or she "'may be able to prove the existence of a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law.'" *Id.* (quoting *Monell*, 436 U.S. at 691) (citation and quotation marks omitted).

In this case, Baker appears to be alleging three bases for liability against Union Township, which are: (1) Union Township Police Department's General Orders PM 6-02 Response to Resistance Policy ("Response to Resistance Policy"); (2) Union Township's alleged failure to train on the constitutional uses of a Taser; and (3) Union Township's ratification of Baker's conduct. The Court will address each basis below.

### a. Response to Resistance Policy Relating to Taser Use

A plaintiff asserting a Section 1983 claim on the basis of a municipal custom or policy must "'identify the policy, connect the policy to the [Township] itself and show that the particular injury was incurred because of the execution of that policy.'" *Graham v. County of Washtenaw*, 358 F.3d 377, 383 (6th Cir. 2004) (quoting *Garner v. Memphis*

30

*Police Dep't*, 8 F.3d 358, 364 (6th Cir. 1993), *cert. denied*, 510 U.S. 1177, 127 L. Ed. 2d 565, 114 S. Ct. 1219 (1994)).  Here, Baker's claim is based upon a particular provision of the Response to Resistance Policy.  (Doc. 27-2, p. 8).  Union Township does not dispute that the Response to Resistance Policy constitutes a policy of the Union Township Police Department.

The primary issue here is whether Baker has set forth sufficient facts to establish that the alleged constitutional violation happened "because of" the execution of the Response to Resistance Policy.  There must be "a direct causal link" between the policy and the alleged constitutional violation such that Union Township's "deliberate conduct" can be deemed the "moving force" behind the violation.  *Graham*, 358 F.3d at 383 (citing *Waters v. City of Morristown*, 242 F.3d 353, 362 (6th Cir. 2001) (citing *Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 404, 137 L. Ed. 2d 626, 117 S. Ct. 1382 (1997)).  "These stringent standards are 'necessary to avoid de facto respondeat superior liability explicitly prohibited by *Monell*.'"  *Graham*, 358 F.3d at 383 (quoting *Doe v. Claiborne Cnty.*, 103 F.3d 495, 508 (6th Cir. 1996)).  Applying these standards, the Court concludes that Baker has failed to establish the requisite causal link between the Response to Resistance Policy and the alleged constitutional violation.

Baker contends that "Union Township's policy and training authorized excessive force in violation of the law because Union Township allowed an officer to use force without first balancing the risk to the government's interest in seizing a non-violent, non-fleeing, non-resisting suspect."  (Doc. 39, p. 17).  Baker specifically cites to Section XII of the Response to Resistance Policy, which he contends "permit[s] officers to tase a non-resisting, non-fleeing, non-violent suspect for disobeying a command."  (Doc. 39, p. 19; *see also* Doc. 27-2, p. 8).  Baker further contends that "if the jury finds that Baker

was not resisting and not fleeing and that Officer Ventre nonetheless tased him, a jury could find that the Township failed to have policies and training in place to prevent [O]fficer Ventre from using excessive force."  (Doc. 39, p. 19).

There are several flaws in Baker's argument that preclude a finding of liability based on Union Township's Response to Resistance Policy.  First, contrary to Baker's contentions, the Response to Resistance Policy does not authorize use of force without consideration of the circumstances.  Section XXII of that policy provides that a Taser "may be used when it reasonably appears that it will be the most effective non-lethal response to resistance option, *balancing the need to arrest or subdue the person*; the likelihood of injury to the person, to innocent bystanders, or law enforcement officers; and officer safety concerns . . . [and] [i]n all cases, the totality of the circumstances at the time will be considered when establishing whether use of a defensive weapon was an appropriate response to resistance."  (Doc. 27-2, p. 8) (emphasis added).  While the policy may not expressly address the specific circumstances in this case, it does provide necessary discretion to an officer to make critical decisions in rapidly evolving situations.  As such, Baker's first argument does not hold up upon closer scrutiny.

Second, Baker has not demonstrated that the execution of that particular policy directly caused the alleged constitutional violation.  To the extent that Baker intends to argue that the specific policies that permit tasing an individual who disobeys commands or who is passively resisting are on their face unconstitutional because they allow tasing of misdemeanant suspects who were not fleeing or actively resisting, the Court finds the argument unpersuasive.  As addressed above with respect to the Section 1983 claim against Officer Ventre, there is not a clearly established constitutional right not to be tased when directly disobeying a command even when the alleged crime is a

misdemeanor. *See Hagans v. Franklin Cnty. Sheriff's Office*, 695 F.3d 505, 508-09 (6th Cir. 2012) (citing relevant caselaw); *Cockrell v. City of Cincinnati*, 498 F. App'x 491, 495-96 (6th Cir. 2012) (citing relevant caselaw). Nor is there a clearly established constitutional right not to be tased when offering passive resistance. *See Hagans*, 695 F.3d at 508-09; *Cockrell*, 498 F. App'x at 495-96. Rather, the caselaw provides a clearly established constitutional right not to be tased when the suspect has done nothing to resist, is already detained, offers no resistance, or is compliant. *See Hagans*, 695 F.3d at 508-09; *Cockrell*, 498 F. App'x at 495-96. Baker does not complain that the Response to Resistance Policy permits tasing in any of the latter circumstances where a clear constitutional right has been established or that those policies were the moving force behind the alleged constitutional violations in this case.

Baker also appears to argue that the causal link is established based on the following logic: the Response to Resistance Policy existed, that policy permitted tasing of a suspect disobeying a command or passively resisting, Officer Ventre generally followed Union Township's Response to Resistance policies,[5] Officer Ventre may have used excessive force in this case, and if he used excessive force, then the policies on which he was trained obviously were inadequate to prevent excessive force. That logic, however, is insufficient to demonstrate that the Response to Resistance Policy was the moving force behind the alleged constitutional violation. Instead of identifying how the particular policy directly caused the violation, Baker attempts to show that an alleged constitutional violation demonstrates that the particular policy must be inadequate. However, if the Court followed Baker's logic, then any time excessive force is found, the

---

[5] Notably, the portions of Officer Ventre's transcript relied upon by Baker do not indicate that Officer Ventre followed the particular policy to which Baker cites in deciding to deploy his Taser in this case. (*See* Doc. 27, pp. 40, 69) (explaining that the policy permits tasing for passive resistance, for passive resistance after disobeying a command, and for fleeing suspects).

plaintiff could attribute the excessive force back to the policies of the police department being inadequate, even if factors other than the policy (e.g., an individual officer's personal vendetta) were the moving force behind the alleged constitutional violation. Such a result does not comport with the stringent standards for municipal liability because it leads to de facto respondeat superior liability, which is explicitly prohibited by *Monnell*. Accordingly, Baker has not presented any genuine issues of material fact as to whether Union Township's Response to Resistance Policy was the moving force behind the alleged constitutional violation, and therefore, summary judgment is granted to Union Township on Baker's claim for municipal liability under Section 1983 based upon that written policy.

### b.  Training

However, it is not only written policies that are actionable under Section 1983. The Supreme Court has held that inadequacy of police training also may serve as a basis for Section 1983 municipal liability but only where the failure to train amounts to deliberate indifference to the rights of persons with whom police come into contact, i.e., deliberate indifference to injuries that are likely to result from a failure to train. *City of Canton v. Harris*, 489 U.S. 378, 388, 109 S. Ct. 1197; 103 L. Ed. 2d 412 (1989); *see also Fisher v. Harden*, 398 F.3d 837, 849 (6th Cir. 2005).  There are at least two types of situations that have been found to justify a finding of deliberate indifference in failure to train police officers:  (1) the failure to provide adequate training in light of foreseeable consequences that could result from a lack of instruction; and (2) the city's failure to act in response to repeated complaints of constitutional violations by its officers. *Brown v. Shaner*, 172 F.3d 927, 931 (6th Cir. 1999) (citing *Canton*, 489 U.S at 390).  The

Supreme Court recently explained the "tenuous" nature of a § 1983 claim that "turns on

a failure to train":

> In limited circumstances, a local government's decision not to train certain employees about their legal duty to avoid violating citizens' rights may rise to the level of an official government policy for purposes of § 1983. A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train. *See Oklahoma City v. Tuttle*, 471 U.S. 808, 822-823, 105 S. Ct. 2427, 85 L. Ed. 2d 791 (1985) (plurality opinion) ("[A] 'policy' of 'inadequate training'" is "far more nebulous, and a good deal further removed from the constitutional violation, than was the policy in *Monell*"). To satisfy the statute, a municipality's failure to train its employees in a relevant respect must amount to "deliberate indifference to the rights of persons with whom the [untrained employees] come into contact." *Canton*, 489 U.S., at 388. Only then "can such a shortcoming be properly thought of as a city 'policy or custom' that is actionable under § 1983." *Id.*, at 389.
>
> "'[D]eliberate indifference' is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." [*Bd. of Comm'rs of*] *Bryan C[n]ty. [v. Brown*,] 520 U.S. [397, 410, 117 S. Ct. 1382, 137 L. Ed. 2d 626 [(1997)]. Thus, when city policymakers are on actual or constructive notice that a particular omission in their training program causes city employees to violate citizens' constitutional rights, the city may be deemed deliberately indifferent if the policymakers choose to retain that program. *Id.* at 407. The city's "policy of inaction" in light of notice that its program will cause constitutional violations "is the functional equivalent of a decision by the city itself to violate the Constitution." *Canton*, 489 U.S., at 395 (O'Connor, J., concurring in part and dissenting in part). A less stringent standard of fault for a failure-to-train claim "would result in *de facto respondeat superior* liability on municipalities . . . ." *Id.*, at 392; *see also Pembaur [v. City of Cincinnati*, 475 U.S. 469], 483, [106 S. Ct. 1292, 89 L. Ed. 2d 452 (1986)] (opinion of Brennan, J.) ("[M]unicipal liability under § 1983 attaches where--and only where--a deliberate choice to follow a course of action is made from among various alternatives by [the relevant] officials . . . .").

*Connick v. Thompson*, __ U.S. __, 131 S. Ct. 1350, 1359-60, 179 L. Ed. 2d 417 (2011).

The Supreme Court went on to explain the type of evidence necessary to establish that

a municipality was deliberately indifferent to the rights of persons with whom the untrained employees come into contact:

> A pattern of similar constitutional violations by untrained employees is "ordinarily necessary" to demonstrate deliberate indifference for purposes of failure to train. *Bryan Cty.*, 520 U.S., at 409. Policymakers' "continued adherence to an approach that they know or should know has failed to prevent tortious conduct by employees may establish the conscious disregard for the consequences of their action--the 'deliberate indifference'--necessary to trigger municipal liability." *Id.*, at 407. Without notice that a course of training is deficient in a particular respect, decisionmakers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights.

*Id.* at 1360 (parallel citations omitted).

In the instant action, Baker does not support his claim with evidence of a pattern of similar alleged constitutional violations. Although Baker mentions in the "ratification" section of his argument that Union Township has never found excessive force or disciplined an officer for use of excessive force, he has not shown deliberate indifference by Union Township because that evidence does not show that were any, much less repeated, complaints or concerns about the use of excessive force by Union Township officers.

Instead, Baker relies on "single-incident" liability to support his claim based on inadequate training. That type of liability attaches only when the alleged constitutional violation was the "obvious" consequence of failing to provide specific training. *Connick*, 131 S. Ct. at 1361. That showing of "obviousness" can substitute for the pattern of violations ordinarily necessary to establish municipal culpability. *Id.* In *Canton*, 489 U.S. 390, the Court posed the hypothetical example of a city that arms its police force with firearms and deploys the armed officers into the public to capture fleeing felons without training the officers in the constitutional limitation on the use of deadly force."

36

*Id.* (citing *Canton*, 489 U.S. at 390, n. 10).  "Given the known frequency with which police attempt to arrest fleeing felons and the 'predictability that an officer lacking specific tools to handle that situation will violate citizens' rights,' the Court theorized that a city's decision not to train the officers about constitutional limits on the use of deadly force could reflect the city's deliberate indifference to the 'highly predictable consequence,' namely, violations of constitutional rights."  *Id.* (citing *Bryan Cnty.,* 520 U.S. at 409; *Canton*, 489 U.S. at 390 n. 10).

This case is not that rare case where the alleged failure to train was so patently obvious that Union Township would be liable under Section 1983 without proof of a pre-existing pattern of violations. Unlike in the *Canton* hypothetical, Baker admits that Officer Ventre was trained on Taser use and that Union Township had policies that included guidelines on when the use of a Taser was permissible.  (Doc. 39, p. 19).  Baker also has dropped his claim for failure to train on the use of Tasers on elevated surfaces.  (Doc. 39, p. 17 n. 4).  Instead, Baker appears to contend only that the lack of sufficient training is evident if Officer Ventre is found to have used excessive force.  The Court disagrees with that logic.  While such a finding may show that the execution of the policy was improper, it does nothing to explain what training was or was not provided to officers or how that training was so obviously inadequate it could not have prevented the constitutional violations in this case.  Certainly, it does not demonstrate that Union Township acted with deliberate indifference in regards to its training.

To the extent that Baker is contending that the policy is unconstitutional on its face such that training on that policy obviously would lead to the use of excessive force, the Court concludes that for the reasons previously explained in relation to the Response to Resistance Policy (*supra*, pp. 32-33) that the policy was not on its face

unconstitutional.  As such, any training in accordance with that policy does not plainly reflect deliberate indifference to the "highly predictable consequence" of the violation of constitutional rights.

For the foregoing reasons, summary judgment is granted in favor of Union Township on Baker's claim for municipality liability under Section 1983 based on a failure to train.

### c.  Ratification

A municipality is not liable for the conduct of its non-policymaking employees who act contrary to the policies of the municipality.  *Turner v. City of Taylor*, 412 F.3d 629, 646 (6th Cir. 2005).  A municipality, however, may be liable for the unconstitutional decision of its non-policymaking employees if it ratifies those decisions.  *Praprotnik*, 485 U.S. at 127.  There are two methods of ratification that are relevant in this case.

The first method of ratification occurs when an individual with policymaking authority issues a final decision affirming a subordinate's decision on the merits or otherwise, and thereby adopting it as municipal policy.  *Id.*; *see also Meyers v. City of Cincinnati*, 14 F.3d 1115, 1118-19 (6th Cir. 1994).  However, even if the municipality ratified the decision, the plaintiff still would have to prove that the ratification was a "moving force" in causing the constitutional violation.  *Feliciano v. City of Cleveland*, 988 F.2d 649, 656 (6th Cir. 1993) (citing *Williams v. Ellington*, 936 F.2d 881 (6th Cir. 1991)); *see also Peabody v. Perry Twp.*, No. 2:10-cv-1078, 2013 U.S. Dist. LEXIS 46344, at *36 (S.D. Ohio Mar. 29, 2013).  A "single, isolated decision" by a policymaker is insufficient to demonstrate that a decision was the moving force behind a constitutional violation.  *Williams*, 936 F.2d at 884-85.  Instead, for ratification by a policymaker's final approval to be the "moving force" behind a constitutional violation, the plaintiff must show that

38

there was a history or pattern of unconstitutional decision-making by the policymakers. *Id.* (finding that a policymaker's ratification of the employee's conduct was not the moving force behind a constitutional violation because"[t]here was no history that the policy had been repeatedly or even sporadically misapplied by school officials in the past").

Here, Baker has set forth testimony from Chief Zinser that indicates that Chief Zinser, as a final policymaker, issued a final decision in which he found Officer Ventre's conduct complied with Union Township's policies on use of force. (*See* Doc. 25, pp. 19, 32). However, Baker has not demonstrated that the ratification was the "moving force" behind the alleged constitutional violation. The only argument set forth by Baker on this issue is that Union Township has never found excessive force or disciplined an officer for his use of force. That evidence, however, does not show any repeated, or even sporadic, misapplication of any portion of the Response to Resistance Policy by Union Township's policymakers. Absent evidence of circumstances from which the Court could reasonably infer prior misapplications of the policy, the Court cannot conclude that the ratification of Officer Ventre's conduct was the "moving force" behind the alleged constitutional violation. Thus, Baker has failed to show that Union Township can be liable pursuant to the first ratification theory, and summary judgment is granted to Union Township on Baker's claim for municipal liability under Section 1983 based upon that ratification theory.

However, the second method of ratification under which Union Township may be liable occurs when a policymaker fails to meaningfully investigate the acts of the officer. *See Wright v. City of Canton*, 138 F. Supp. 2d 955, 966 (N.D. Ohio 2001); *Leach v. Shelby Cnty. Sheriff*, 891 F.2d 1241, 1246-48 (6th Cir. 1989); *Marchese v. Lucas*, 758

F.2d 181, 188 (6th Cir. 1985). "[E]vidence that a municipality inadequately investigated an alleged constitutional violation can be seen as evidence of a policy that would condone the conduct at issue." *Otero v. Wood*, 316 F. Supp. 2d 612, 627-28 (S.D. Ohio 2004); *see also Peabody*, 2013 U.S. Dist. LEXIS 46344, at *37 (relying on *Otero*).

A municipality fails to meaningfully investigate when it does not conduct any investigation into the alleged unconstitutional conduct. *See Leach*, 891 F.2d at 1246-48 (county sheriff's failure to investigate his employees' failure to provide for the medical needs of a paraplegic inmate was sufficient to demonstrate ratification of the unconstitutional acts such that municipal liability attached); *Marchese*, 758 F.2d at 188 (county sheriff's failure to investigate his deputies' beating of an inmate constituted ratification of the deputies' unconstitutional acts). A municipality also may fail to meaningfully investigate when the evidence shows that "the investigation was not designed to discover what actually happened[.]" *Wright*, 138 F. Supp. 2d at 966. In *Wright*, the district court found that a reasonable juror could conclude that the city police chief's approval of the investigation meant that the city ratified the alleged use of excessive force because the plaintiff offered "evidence showing the investigation was not designed to discover what actually happened to Wright while in [the officers'] custody." 138 F. Supp. 2d at 966. In rendering its decision, the district court noted:

> Most notably, Captain Myers never interviewed Dr. Hamrick as part of his internal affairs investigation. Myers never discussed Wright's injuries with Dr. Hamrick. Nor did he inquire as to [the officers'] behavior the night of the incident. Thus, Myers concluded his investigation without knowing that Dr. Hamrick (1) insists [the officers] gave three different stories as to how Wright suffered his injuries and (2) believes Wright was not injured as a result of a single takedown.

*Id.* at 966-67.

However, a municipality does meaningfully investigate when multiple steps were taken to ensure that an accurate account of the incident is received and that a thorough and objective evaluation of the circumstances involved has occurred prior to a final decision being rendered on the incident.  *See Peabody*, 2013 U.S. Dist. LEXIS 46344, at *40-41.  For example, in *Peabody*, an officer tased a theft suspect who was climbing a fence.  *Id.* at *3-4.  The Chief undertook an investigation and determined that the officer had complied with its Use of Force policy.  *Id.* at *7.  Following the incident, the township was sued under Section 1983 for, among other things, ratifying the alleged unconstitutional conduct of the officer.  *Id.* at *39-41.  In considering whether the Chief's investigation was so inadequate as to constitute ratification of unconstitutional conduct, the district court noted:

> Chief Oppenheimer spent several hours reviewing the incident reports, watched the cruiser video thirty to forty times and spoke with the Township attorneys regarding Officer Bean's actions. The Chief focused his investigation on trying to determine when Officer Bean pulled the trigger, thereby deploying his taser toward Hook. Chief Oppenheimer spoke to other police chiefs regarding the event as part of his review.  Additionally, Chief Oppenheimer interviewed Officer Bean regarding his account of the incident at issue. He also referred the matter to Lieutenant Robert Pendleton for an objective review of this incident. Lieutenant Pendleton authored a "Use of Force Investigation Report."

*Id.* at *40-41 (internal citations omitted).  Based on those facts, the district court held that "[e]ven when viewing the evidence in the light most favorable to Plaintiffs, and drawing all justifiable inferences in their favor" that "no reasonable jury could find that the investigation into Officer Bean's taking of Hook was so inadequate as to constitute a ratification of his alleged use of excessive force that is sufficient to support § 1983 liability."  *Id.* at *41.

In the present case, the Court finds that, although it is a close call, genuine issues of material fact exist as to whether Union Township conducted a meaningful investigation. There is no dispute that Chief Zinser was a final policymaker for Union Township. (*See* Doc. 25, p. 21) (Zinser testified that he is the final decision maker on the policies and the final implementer of the policies). Chief Zinser's investigation of the case included a review of Officer Ventre's use of force, the incident report, use of force reports, summary of witness interviews, Taser download report, and photographs. (Doc. 25, pp. 23-25, 32). There is also evidence that Chief Zinser consulted with two individuals on his staff, Lieutenant Gavilglia and Sergeant Mills, before coming to a decision with respect to the incident. (Doc. 25, pp. 8-10). Chief Zinser did not, however, interview Officer Ventre to confirm his account of the incident or interview Officer Ventre's partner, Officer Smith, regarding her account of the incident. (Doc. 25, pp. 8-9). There also is not evidence presented that an interview was conducted with Baker or Jones, who both had accounts of the incident that differed from the written account of the incident provided by Officer Ventre. (Doc. 25, pp. 26, 47-48). Moreover, the Court has not been directed to any evidence showing whether or to what extent attempts were made to confirm that the locations of the Taser hits on Baker comported with Officer Ventre's written account of the incident. Based on this evidence, or lack thereof, a reasonable jury might conclude such actions show Union Township ratified Officer Ventre's actions without conducting a meaningful investigation. Accordingly, the Court denies summary judgment to Union Township on Baker's claim against Union Township for municipal liability under Section 1983 based upon ratification of Officer Ventre's conduct through a failure to conduct a meaningful investigation.

## IV.   **CONCLUSION**

For the foregoing reasons, Defendants' Motion for Summary Judgment (Doc. 28) is **GRANTED IN PART** and **DENIED IN PART**.  Specifically, it is **ORDERED** that:

1.  Summary judgment is GRANTED as to:

    a.  Jones' claim for negligent infliction of emotional distress against Officer Ventre; and

    b.  Baker's Section 1983 claim for municipal liability against Union Township based on the Response to Resistance Policy, an alleged failure to train, and Union Township's alleged ratification of Officer Ventre's conduct being the moving force behind the alleged constitutional violation.

2.  Summary judgment is DENIED as to:

    a.  Baker's Section 1983 claim against Officer Ventre;

    b.  Baker's assault and battery claims against Officer Ventre;

    c.  The issue of punitive damages; and

    d.  Baker's Section 1983 claim for municipal liability against Union based on ratification of Officer Ventre's conduct by failing to meaningfully investigate the February 14, 2011 incident.

**IT IS SO ORDERED.**

                                                   s/ Michael R. Barrett
                                                   Michael R. Barrett, Judge
                                                   United States District Court